## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 2:13-cr-00049-NT |
| | ) | |
| DEREK HINKLEY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON THE DEFENDANT'S MOTIONS TO SUPPRESS

The Defendant brings three motions to suppress. In his first motion, the Defendant seeks to suppress the statements he made to Detective Derrick St. Laurent in a stationhouse interrogation on July 19, 2012. Def.'s First Mot. to Suppress (ECF No. 39). The Defendant alleges that he was in custody during the entire interview though he was not given *Miranda* warnings until more than halfway through it. The Defendant further argues that St. Laurent failed to obtain a knowing and intelligent waiver of the Defendant's rights. The Government counters that the Defendant was not in custody until the point that St. Laurent informed him he was no longer free to leave and that St. Laurent gave Hinkley adequate *Miranda* warnings immediately afterwards.

In his second motion, the Defendant seeks to suppress physical evidence seized during a search of the Defendant's apartment after the July 19, 2012 stationhouse interrogation. Def.'s Second Mot. to Suppress (ECF No. 40). The Defendant argues that the evidence seized during the search should be suppressed

as "fruit of the poisonous tree" emanating from the original *Miranda* violation. The Defendant further argues that he did not consent to the search but merely acquiesced to St. Laurent's announcement that he was going to search the Defendant's apartment. The Government counters that there was no *Miranda* violation and that the Defendant freely and voluntarily consented to the search after being informed of his right to refuse consent.

In his third motion, the Defendant seeks to suppress the statements he made to St. Laurent in a follow-up interrogation at the Androscoggin County Jail on July 20, 2012. Def.'s Third Mot. to Suppress (ECF No. 41). The Defendant argues that St. Laurent's mere reference to *Miranda* warnings given the day before was inadequate for three reasons: (1) the previous day's warnings were faulty; (2) fresh warnings should have been given; and (3) the Defendant never executed a valid waiver of his rights. The Government argues that St. Laurent ensured that the Defendant was aware of his rights and that St. Laurent was not required to read the Defendant the *Miranda* warnings a second time.

For the reasons discussed below, the Court **DENIES** the Defendant's motions.

## FINDINGS OF FACT

### I.    The Evidence Presented

This Court held a hearing on the Defendant's motions to suppress on Tuesday, December 3, 2013. The Defendant presented the testimony of Dr. Peter Donnelly, a psychologist who examined the Defendant in September of 2013. The

Defendant also offered Dr. Donnelly's written evaluation as an exhibit (Def.'s Ex. 1). The Government presented the testimony of St. Laurent, the detective who interviewed the Defendant and secured consent to search his apartment. The Government also offered as exhibits a video recording of St. Laurent's July 19, 2012 stationhouse interview of the Defendant (Gov't Ex. 1), an audio recording of St. Laurent's July 20, 2012 jailhouse interview of the Defendant (Gov't Ex. 2), a copy of a letter purportedly written by the Defendant and recovered from his possession while he was in custody in county jail (Gov't Ex. 3), and a consent-to-search form signed by the Defendant and dated July 19, 2012 (Gov't Ex. 4).

## II.    St. Laurent's Stationhouse Interrogation of Hinkley

In the late afternoon of July 19, 2012, the Lewiston Police Department received a call from the parents of a twelve-year-old boy. The parents complained that their son and a fifteen-year-old friend had stayed over at the house of a man named Derek Hinkley and that this man had showed the boys pornography and forced one of the boys to masturbate using a sex toy. They also claimed that the man had threatened to cut off the boys' penises if they did not comply. St. Laurent's watch commander instructed him to go to the victims' homes to make sure they felt safe for the night and let their parents know that a detective responsible for juvenile cases would be out to interview them the next day.

St. Laurent drove to the victims' neighborhood in an unmarked police car, wearing street clothes, a badge and a holstered firearm. En route, the detective noticed a man—the Defendant—standing astride a bicycle and talking to a gathering of neighborhood children. Acting on a hunch, St. Laurent approached the

man and asked him to identify himself. When the man indicated that his name was Ethan, St. Laurent asked for identification. The man produced a government I.D. that listed his name as Derek Hinkley. Hinkley explained that, though he goes by the name Ethan, his legal name is Derek. At this point, a man began hollering at Hinkley from across the street, saying something to the effect that he would pay for what he had done and that he had better stay away from the neighborhood. St. Laurent told Hinkley he wanted to speak with him and asked Hinkley if he would mind coming to the nearby Lewiston Police Department stationhouse. Hinkley agreed to do so. St. Laurent testified that he prefers conducting interviews at the stationhouse because its interview rooms are equipped with recording equipment.

Hinkley rode his bike to the station and waited for St. Laurent in the lobby. St. Laurent, who arrived shortly thereafter, escorted Hinkley to a windowless, eight-foot by twelve-foot interview room furnished with four plain chairs and a table.

The entire interview was videotaped. As the video began recording, Hinkley sat alone in the interrogation room, fiddling with his iPod and drinking from a bottle of soda. After about two minutes, St. Laurent came in and sat down across from Hinkley. Because St. Laurent was the only detective on-call for the evening, he had to leave the room several times during the interview. Hinkley later reported to Dr. Donnnelly that each time St. Laurent left the room, he could see another police officer outside the door. St. Laurent testified that no one was assigned to guard the door.

The interview began in a polite, conversational tone. "Just so we can clarify things up, you're not in custody right now," St. Laurent told Hinkley. He quickly reviewed how to exit the building. "If there was an emergency, would you know how to get out of here? Right, right, then left." St. Laurent then asked whether Hinkley minded if the door to the interrogation room remained shut. Hinkley told St. Laurent it was okay.

Next, St. Laurent asked Hinkley if he knew why St. Laurent wanted to speak with him. Hinkley responded by acknowledging that the two boys—he identified them by first name—had been over to his house. Hinkley claimed he had seen the boys hanging out on the street in a tough part of Lewiston and invited them over so they would have a safe place to pass the time. "We just hung out and watched movies and that's about it," Hinkley explained. When St. Laurent asked Hinkley if anything "inappropriate" had happened, Hinkley conceded that the boys may have seen a sex toy that he had inadvertently left on his nightstand, but claimed he quickly hid it when he realized he had left it out. He maintained that nothing else inappropriate had happened.

St. Laurent responded to Hinkley's denials skeptically. Approximately six and a half minutes into the video, St. Laurent told Hinkley that the police were "obviously . . . going to search your house" and warned Hinkley that "the truth is going to come out." St. Laurent added, "[I]f I think you're lying to me, I'm gonna work extra hard to make you . . . look like . . . a liar. . . . When I have to spend a lot of time, you do a lot of time." Around the twenty-minute mark, St. Laurent accused

Hinkley of "leaving something wicked big out" and told him that he thought he was lying because his statement conflicted with the victims' accounts. St. Laurent said it was in Hinkley's interest to be more truthful, since the police would soon search Hinkley's apartment and find incriminating evidence. He warned Hinkley that he would "go through [his] house" with a black light to find semen spots, "rip 'em out," and send them to a lab to see if they contained the boys' DNA. St. Laurent pleaded with Hinkley to be more forthcoming, asking him to help "solve this right now."

A little less than twenty-nine minutes into the video, St. Laurent told Hinkley that he was "still free to leave." Hinkley remained in the room and the conversation proceeded much as before. At around the thirty-minute mark, St. Laurent returned to a technique he had used a few minutes before, telling Hinkley that he would be able collect DNA from the sex toy in Hinkley's apartment, no matter how hard Hinkley tried to clean it, so Hinkley should come forward with the truth now. And at the thirty-one minute mark, St. Laurent again pleaded with Hinkley to admit to wrongdoing:

> Why can't we just resolve this? . . . . We want to get you help, the help that you need. . . . But in order for you to get help, you need to admit that you have a problem . . . .

Hinkley steadfastly denied that he had done anything wrong or that he had any "problem."

By this point in the interview, Hinkley had already made several damaging statements. At the thirty-eight minute mark, St. Laurent finally placed Hinkley under arrest. "I just tried to help you the best I could," he said to Hinkley, "now I

have to help everybody else." Without further explanation, St. Laurent pulled a sheet of paper from a folder and placed it on the table. It later became clear that the paper was a blank consent-to-search form. "We're going to search your apartment and you're not free to go anymore," St. Laurent told Hinkley.

St. Laurent took out a small piece of paper the size of a business card and began reading *Miranda* warnings from it. After reciting each of the rights, St. Laurent asked if Hinkley understood. Each time, Hinkley responded in the affirmative, either by saying "Mhmmm hmmm" or "Yes, sir." St. Laurent read the warnings quickly and interrupted the recitation at one point to check his cell phone, which was buzzing. After completing all the warnings, St. Laurent asked Hinkley if he had any questions about his rights. "No, sir," Hinkley responded.

Next, St. Laurent told Hinkley, "We'd like to search your apartment obviously." St. Laurent explained that the search would allow the police to corroborate details of the victims' account and prove that Hinkley was lying.

St. Laurent then began to fill out the as-yet-unidentified consent form he had placed on the table earlier. St. Laurent asked Hinkley how to spell his first name and started to print it in the form's first blank, but he was interrupted when his phone started buzzing again. St. Laurent excused himself from the room, grabbing his folder and the partially filled out form as he left. At about the forty-three minute mark, St. Laurent returned. He opened the folder, pulled out the consent form, and resumed filling in its blanks based on information elicited from Hinkley.

Though St. Laurent still had not explained what the form was or what function it served, he began reading its contents to Hinkley. St. Laurent was filling out the form's final blanks as he did this, so his delivery was disjointed. At points he used the first person to refer to Hinkley, but at other points he used the second person. More confusing still, St. Laurent sometimes used the first person to refer to himself instead. At another point, St. Laurent confused Hinkley's *Miranda* rights with his Fourth Amendment right not to consent to a search. The following is a transcript of St. Laurent reading the form, with portions the Court finds particularly confusing italicized:

ST. LAURENT:    I, Derek Hinkley, *which is you*, have been informed of my constitutional rights, *which I just read you*, ah, not to have a search made of my premise hereinafter mentioned without a warrant and of my right to refuse consent to search, hereby authorized *by me*, Detective Derrick St. Laurent and *whoever else I may bring along with me*, ah, police officers from, ah, the City of Lewiston, Maine, to conduct a complete search of your apartment. What's your address over there?

HINKLEY:    [Hinkley's address].

ST. LAURENT:    In Lewiston, right?

HINKLEY:    Yes, sir.

ST. LAURENT:    These police officers are authorized *by me* to take, ah, from the premise illegal items, articles, letters, papers, materials and other property, ah, which they may desire. This written permission is given *to me*, ah, *by the above named police officers* voluntarily and, without threats or promises of any kind. Do you have any objection to that?

HINKLEY:    No, sir.

8

| ST. LAURENT: | Okay. So you're giving us consent to search your apartment? |
|---|---|
| HINKLEY: | Yes, sir. |
| ST. LAURENT: | For the items that the kids obviously say. |
| HINKLEY: | Yes, sir. |

As confusing as this exchange is in writing, the video shows that it was even more confusing live. The transcript fails to capture the way St. Laurent stumbled on several of his words, sped up his cadence at the end of certain phrases, and punctuated sentences with odd, displaced pauses.

Finally, St. Laurent handed Hinkley the consent-to-search form and a pen. "You wanna sign that for me and date it for me?" St. Laurent asked. Hinkley reached for the form. Before he could read or sign it, St. Laurent asked Hinkley if there was anything else he wanted to talk about. Hinkley began to answer, launching into a narrative about how it was the boys who had asked Hinkley if they could watch pornography at his house, not the other way around. Hinkley put the pen down as he spoke.

St. Laurent pulled the paper toward himself momentarily, but then pushed it back toward Hinkley. "Just sign that first," St. Laurent said, interrupting Hinkley's story. Hinkley picked up the pen, but continued telling his story instead of signing. After listening for a few more moments, St. Laurent again interrupted Hinkley. "Will you just sign that for me, please?" St. Laurent said, reaching across the table to point to the signature line on the consent form. "Yes," Hinkley said. Hinkley then

signed and dated the form. It does not appear that Hinkley had time to read what he was signing.

Near the end of the interview, St. Laurent asked for the keys to Hinkley's apartment. Hinkley told St. Laurent that the police could retrieve the keys from Hinkley's bag. St. Laurent asked whether Hinkley wanted to be present when the police searched his apartment and Hinkley responded that he did.

## III.  The Lewiston Police Department's Search of Hinkley's Apartment

After the interview was over, officers searched Hinkley's apartment in his presence and seized several items, including a laptop computer and the sex toy Hinkley had mentioned to St. Laurent. According to St. Laurent, Hinkley was cooperative and helpful throughout. The police then transported Hinkley to Androscoggin County Jail.

## IV.  St. Laurent's Jailhouse Interrogation of Hinkley

The next day St. Laurent visited Hinkley at the jail to ask him about new information gleaned from the alleged victims. Hinkley was being held in maximum security on a suicide watch. St. Laurent tape-recorded the interview, which began around 5 p.m. and ended at around 5:30 p.m. He testified that his recording captured the entirety of the conversation. St. Laurent was again wearing plain clothes, but his firearm had been removed by jail security.

At the start of the interview, the following colloquy occurred:

ST. LAURENT:     I read you your rights yesterday.

HINKLEY:     Yes, sir.

ST. LAURENT:     Do you remember what those rights are?

| HINKLEY: | Yes, sir. |
|---|---|
| ST. LAURENT: | Do you want me to repeat them or . . . do you think you know what they are? |
| HINKLEY: | I'm, ah, familiar with them, yes. |

In the ensuing interview, Hinkley made several incriminating statements.

## V.  Dr. Donnelly's Psychological Evaluation of Hinkley

Over a year later, in September of 2013, Dr. Donnelly examined Hinkley on behalf of defense counsel in order to evaluate his emotional and cognitive capacity to waive *Miranda* rights and provide consent to a search. Dr. Donnelly met with Hinkley three times, speaking with him for a total of five hours. During these conversations, Donnelly performed four psychiatric tests, including an intelligence test, a personality test, a Rorshach test, and a test titled "Grisso's Understanding and Appreciation of Miranda Rights Instrument." Def.'s Ex. 1 at 2. Dr. Donnelly also interviewed Hinkley's parents, reviewed his school, employment, and mental health records, watched the video of the July 19, 2012 stationhouse interrogation, and listened to the recording of the July 20, 2012 jailhouse interrogation.

Dr. Donnelly determined that Hinkley has an I.Q. of 102, within the average range of intelligence, that his thinking is "generally logical and coherent," and that his ability to understand and apply *Miranda* warnings is within the low average range. Def.'s Ex. 1 at 4-6. Dr. Donnelly also determined that Hinkley is immature, that he "sees himself as vulnerable and fragile," that he "does not take in adequate amounts of information before he makes decisions," and that he suffers from depression. Def.'s Ex. 1 at 10.

With respect to Hinkley's interrogation, Dr. Donnelly testified that Hinkley saw St. Laurent as an authority figure to whom he had to defer and that Hinkley thought his best route was to answer St. Laurent's questions. With respect to the consent-to-search form, Dr. Donnelly testified that Hinkley believed his signature was a token and that the police were going to search his apartment no matter what. According to Dr. Donnelly, Hinkley was primarily concerned with being present when the police went through his personal belongings. Dr. Donnelly concluded that Hinkley felt he had no other option but to comply with the police.

## DISCUSSION

## I.       Alleged *Miranda* Violations During the Stationhouse Interview

The Defendant's first motion presents two distinct questions: (1) whether the Defendant was in custody for *Miranda* purposes at any point prior to the moment St. Laurent told him he was no longer free to leave, approximately 38 minutes into the July 19, 2012 stationhouse interview; and (2) whether the *Miranda* warnings recited thereafter were ineffective, either because they were inadequate or because the Defendant never waived his right to remain silent.

### A.       Whether the Defendant was in Custody Before His Arrest

#### 1.       The Governing Law

Under the Fifth Amendment, no person "shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that before interrogating a person in their custody, the police must inform that person "that he has a right to

remain silent, that anything he says can be used against him in a court of law, that he has a right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479. The warnings are necessary, the Court explained, because of the compulsion "inherent in custodial surroundings." *Id.* at 458. As the First Circuit has elaborated, the police "have the capacity to dominate the scene" during a custodial interrogation "to such an extent that the risks of coercion and intimidation are unreasonably high" if the warnings are not given. *United States v. Melendez*, 228 F.3d 19, 22 (1st Cir. 2000).

*Miranda* warnings must be given only when an individual is in custody. *United States v. Crooker*, 688 F.3d 1, 10-11 (1st Cir. 2012). Generally speaking, an individual is in custody if he or she has been placed under "formal arrest," or if the individual's freedom of movement has been restrained to "the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983). The Court follows a two-step process to determine whether an individual is in custody. *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). First, the Court determines "the circumstances surrounding the interrogation." *United States v. Hughes*, 640 F.3d 428, 435 (1st Cir. 2011). Second, given those circumstances, the Court determines whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112. The determination of whether an individual is in custody is an objective one. *Stansbury v. California*, 511 U.S. 318, 323 (1994); *Hughes*, 640 F.3d at 435. Accordingly,

undisclosed "subjective views harbored by either the interrogating officers or the person being questioned" are not relevant. *Stansbury*, 511 U.S. at 323-25; *Hughes*, 640 F.3d at 435. "Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue," because "some suspects are free to come and go until the police decide to make an arrest." *Stansbury*, 511 U.S. at 325.

The First Circuit has "identified four factors that, among others, may inform a determination of whether, short of actual arrest, an individual is in custody." *Hughes*, 640 F.3d at 435. These factors include: (1) "whether the suspect was questioned in familiar or at least neutral surroundings"; (2) "the number of law enforcement officers present at the scene"; (3) "the degree of physical restraint placed upon the suspect"; and (4) "the duration and character of the interrogation." *Id.* (quoting *United States v. Ventura*, 85 F.3d 708, 711 (1st Cir. 1996)).

## 2.  Application of the Law to the Facts of the Case

St. Laurent's interrogation of the Defendant was governed by the following circumstances. The Defendant was questioned in a spare, windowless police interrogation room, neither a familiar nor neutral venue. Only one police officer— St. Laurent—was present. Although the presence of police in the hallway might have given a reasonable person in the Defendant's shoes the sense that other officers were involved, the Court credits St. Laurent's testimony that none of his colleagues were assigned to guard the Defendant. The Defendant arrived at the stationhouse under his own power and was never physically restrained. At the beginning of the interview, St. Laurent told the Defendant that he was "not in

custody." About thirty minutes later, St. Laurent reiterated that the Defendant was "still free to leave." The interview was relatively short, proceeding for less than two-thirds of an hour before the Defendant was placed under formal arrest. St. Laurent was dressed in street clothes, not a uniform, but he also wore a gun in a holster. The interview began on polite terms but became more accusatory as time wore on. In the minutes before St. Laurent placed the Defendant under arrest, he vacillated between expressing concern about getting the Defendant "help" and expressing irritation that the Defendant was, in his view, lying. The tone St. Laurent used was generally one of frustration, not anger or aggression.

Considering these circumstances objectively, this case presents a close question as to whether a reasonable person in the Defendant's place would have felt he or she was at liberty to stop the interrogation and leave the stationhouse. On the one hand, St. Laurent told the Defendant in unequivocal terms that he was free to leave. On the other hand, St. Laurent made it clear that he had credible evidence linking the Defendant to a serious crime. The Defendant argues that it was "highly doubtful" that St. Laurent ever "had any intention of letting Hinkley leave the station without placing him under arrest" and suggests that St. Laurent's statement to the contrary during minute twenty-eight of the interview was disingenuous. Def.'s First Mot. to Suppress 3. However, the critical question is whether a reasonable person in the Defendant's circumstances would have believed St. Laurent. St. Laurent's unexpressed subjective intent is simply not relevant. Under the totality of the circumstances, the Court finds by a close margin that a

reasonable person in the Defendant's position would have believed St. Laurent's statements that Hinkley was not in custody and remained free to leave if he wished. Therefore, the Defendant was not in custody for *Miranda* purposes until the moment St. Laurent told him he was no longer free to leave.

**B.** **Whether the *Miranda* Warnings Were Adequate and Whether Detective St. Laurent Secured a Valid Waiver of the Defendant's Rights**

### 1. The Governing Law

There is no "precise formulation" an officer must follow in giving *Miranda* warnings. *California v. Prysock*, 453 U.S. 355, 359 (1981). The law requires only that the officer "fully convey[s] to [the individual] his rights," *id.* at 361, and that the individual validly executes a waiver of those rights. *Miranda*, 384 U.S. at 475.

For decades, the Supreme Court has struggled to define what constitutes a valid waiver. The *Miranda* court held that the prosecution bears a "heavy burden" of demonstrating that "the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel" and that "interrogation must cease" if the "individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent . . . ." *Id.* at 473-475. The *Miranda* court further explained that "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained," but that "[a]n express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver." *Id.*

More recent Supreme Court opinions have recast the issue of waiver in less black-and-white terms. In *Colorado v. Connelly*, 479 U.S. 157 (1986), the Court clarified that the "heavy burden" *Miranda* placed on the state only requires the prosecution to prove the fact of a valid waiver by a "preponderance of the evidence." *Connelly,* 479 U.S. at 168. Likewise, in *North Carolina v. Butler*, 441 U.S. 369 (1979), the Court explained that "[a]n express written or oral statement of waiver of the right to remain silent . . . is not inevitably either necessary or sufficient to establish waiver." *Butler,* 441 U.S. at 373. Finally, in *Berghuis v. Thompkins*, 560 U.S. 370 (2010), the Court ruled that "an accused who wants to invoke his or her right to remain silent" must do so "unambiguously." *Berghuis*, 560 U.S. at 381.

In *Berghuis,* the defendant sat mostly silent through a three-hour interrogation before he answered a question which implicated him in a murder. *Id.* at 372. The defendant argued that his silence should have been taken as an invocation of his right to silence. *Id.* at 384. The Court rejected his argument, holding that "an accused's uncoerced statement establishes an implied waiver of the right to remain silent" in cases "where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused." *Id.* at 384.

### 2.     Application of the Law to the Facts of the Case

At around the 38-minute mark of the stationhouse interrogation, St. Laurent informed the Defendant that he was no longer free to leave and began to read him his rights. The video of the interrogation shows definitively that St. Laurent gave the Defendant each of the warnings required by *Miranda* and that the Defendant acknowledged that he understood each of them.

Based on the written evaluation and testimony of Dr. Donnelly, the Defendant argues that he was psychologically incapable of understanding his *Miranda* rights and therefore could not have knowingly and intelligently waived them. However, Dr. Donnelly testified that the Defendant had average intelligence and the Defendant returned an average score on a test specifically designed to determine whether he could appreciate and apply *Miranda* warnings. Dr. Donnelly also testified that the Defendant thought it was in his best interest to answer questions, implying that he made a calculated decision to do so. The preponderance of the evidence suggests that the Defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights.[1]

## II. Alleged Failure to Obtain Valid Consent to Search Defendant's Apartment

The Defendant's second motion raises two arguments: (1) that evidence taken during the Lewiston Police Department's search of the Defendant's apartment was the product of an earlier *Miranda* violation and should therefore be suppressed as "fruit of the poisonous tree"; and (2) that the Government failed to obtain valid

---

[1]     At oral argument, though not in his written motions, the Defendant also argued that the statements the Defendant made on July 19, 2012 were involuntary. A statement is involuntary, for due process purposes, if it is coerced—that is, if law enforcement officials secure it by overbearing an individual's will. *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963). Courts determine voluntariness by examining "the totality of the circumstances," including "the nature of the police activity and the defendant's situation." *Hughes*, 640 F.3d at 438. During the stationhouse interview, the Defendant was neither physically restrained nor deprived of food or water. The interview was relatively short, lasting for just over an hour. The Defendant is a high school graduate of average intelligence. He remained outwardly composed throughout the interview. His interrogator, St. Laurent, was accusatory, but not abusive. When St. Laurent challenged the Defendant's account, the Defendant did not crumple. Instead he showed the fortitude to continue insisting that he was telling the truth. In short, the totality of the circumstances does not indicate that the Defendant's July 19, 2012 statements were involuntary.

consent before searching the Defendant's apartment and the search therefore violated the Fourth Amendment's prohibition on unreasonable searches.

### A. Whether Evidence Discovered During Search Should Be Suppressed as "Fruit" of Earlier *Miranda* Violation

As there was no *Miranda* violation during the July 19, 2012 stationhouse interrogation, the Court need not consider the Defendant's "fruit of the poisonous tree" argument.

### B. Whether the Defendant Gave Valid Consent to Search

#### 1. The Governing Law

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend IV. This amendment "forbids law enforcement from searching a suspect's home without a warrant unless the search falls under 'one of the "few specifically established and well-delineated exceptions" to the warrant requirement.'" *United States v. Vázquez,* 724 F.3d 15, 18 (1st Cir. 2013) (quoting *United States v. Forbes*, 181 F.3d 1, 5 (1st Cir. 1999) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1st Cir. 1973))). Under one such exception, a warrant is not required where officers receive valid consent to search. *Id*. To establish that this exception applies, "the government must prove valid consent by a preponderance of the evidence." *Forbes*, 181 F.3d at 5. That is, the government must prove that "consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." *Schneckloth*, 412 U.S. at 248. The government does not need to prove that the person giving consent

knowingly or intelligently waived his or her constitutional rights, *id.* at 235-246, or that the individual granting consent knew he or she had the right to refuse consent. *Schneckloth*, 412 U.S. at 234.

The Court determines whether consent was voluntary "by examining the totality of the circumstances, including the interaction between the police and the person alleged to have given consent." *U.S. v. Weidul*, 325 F.3d 50, 53 (1st Cir. 2003). Some factors that may be relevant are the consenting party's "age, education, experience, intelligence, and knowledge of the right to withhold consent," "whether the consenting party was advised of his or her constitutional rights," and "whether permission to search was obtained by coercive means or under inherently coercive circumstances." *United States v. Barnett*, 989 F.2d 546, 555 (1st Cir. 1993). No one factor is determinative. While "sensitivity to the heightened possibility of coercion is appropriate when a defendant's consent is obtained during custody," the mere fact that an individual is in custody does not automatically render consent invalid. *Id.* Likewise, the naked fact that police obtained a signature on a consent-to-search form does not automatically render consent valid. *Vázquez,* 724 F.3d at 20-25.

Finally, the government cannot establish voluntariness merely by showing that the individual granting consent "acquiesce[d] to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) (requiring suppression where officer falsely stated "I have a search warrant to search your house" and home's resident said "go ahead"); *see also Weidul*, 325 F.3d at 53-54 (upholding

suppression where officer stated "I'm going to look in here" and defendant responded by saying "okay"). Where the police inform an individual that they will search even if the individual refuses consent, the individual's subsequent consent is invalid unless the police reasonably believed they already had legal authority to conduct the search or soon would. *Vázquez*, 724 F.3d at 20-25 (where police obtained consent by telling individual they would search even if she declined consent because they already had authority to search, consent valid only "if claimed authority to search was based on a reasonable assessment of the facts"); *United States v. Marshall*, 348 F.3d 281, 285-86 (1st Cir. 2003) (where police obtained consent by telling individual they would obtain a warrant and search even if she declined, consent valid because "[p]robable cause had been established and the officers had a good faith belief that a warrant would issue"); Wayne R. LaFave, 4 *Search & Seizure* § 8.2(c) (5th ed. 2013) (explaining that a threat to obtain a search warrant "is likely to be held to invalidate a subsequent consent if there were not then grounds upon which a warrant could issue," but is "likely not to affect the validity of the consent if the police then had probable cause upon which a warrant could issue" (footnotes omitted)). This rule recognizes that it is not police coercion to inform an individual what the likely consequences will be if the individual refuses consent, thereby providing context for the individual's decision, but that it is police coercion to obtain consent only by tricking an individual into falsely believing a search is inevitable and that declining consent would be futile. *Vázquez*, 724 F.3d at 22; *see*

*also Robbins v. MacKenzie,* 364 F.2d 45, 49–50 (1st Cir. 1966) ("Bowing to events, even if one is not happy about them, is not the same thing as being coerced.").

### 2.    Application of the Law to the Facts of the Case

At the time the Defendant purportedly granted consent to search, he was twenty-eight years old. His behavior during the stationhouse interview was logical and coherent. He responded to questions with context-appropriate answers. He appeared calm. By persistently denying that he was holding information back, he demonstrated that he did not feel so intimidated as to simply fold his tent and acquiesce to whatever was demanded of him. In short, though the Defendant was in police custody, he was not so cowed that he was psychologically incapable of giving valid consent.

Nonetheless, the bungled manner in which St. Laurent secured the Defendant's signature on the consent-to-search form—failing to identify the form for what it was, reading its contents in a confusing, disjointed way, failing to allow the Defendant time to read the form himself, directing the Defendant to sign the form when he hesitated—renders it nearly worthless as evidence of the ultimate question of voluntary consent. A close review of the video, however, shows that St. Laurent straightforwardly asked, "So you're giving us consent to search your apartment?" The Defendant responded, "Yes, sir." This moment demonstrates the Defendant's consent.

This does not end the inquiry, however, as consent is vitiated if it is given in mere acquiescence to a claim of lawful authority. Here, before even asking the Defendant for consent, St. Laurent stated unequivocally and repeatedly that a

search would take place: at around the 6:30 mark ("obviously we're gonna search . . . your house after this"), around the 22:00 mark ("I'm gonna go through your house, I'm gonna find all this stuff"), and around the 30:00 mark ("the [sex] toy that you have . . . . [is] gonna be my key, . . . . we're gonna get . . . DNA off that"). While St. Laurent never explicitly told the Defendant he would get a warrant if he needed to, the message was clear: the police were going to search the Defendant's apartment with or without his consent.[2] Based on these facts, the Court infers that the Defendant's grant of consent was predicated on St. Laurent's unequivocal assertions that a search was going to take place.

This is not fatal to the Government's argument. Under the First Circuit's recent decision in *Vázquez*, the Defendant's consent may yet be valid if St. Laurent's statements implying that police would search the Defendant's apartment whether he consented or not were "based on a reasonable assessment of the facts." *Vázquez*, 724 F.3d 15. Here, St. Laurent's assertions were almost certainly correct. Had the Defendant refused consent, the police would have applied for and received a warrant because they already had probable cause to search the Defendant's apartment.[3] The Defendant's "[b]owing to events" is not the same as coercion. *Robbins*, 364 F.2d at 49-50.

---

[2] Though not dispositive, the live testimony of Dr. Donnelly and St. Laurent supports this conclusion as well. Dr. Donnelly posited that the Defendant only consented because he believed a search was inevitable and he wanted to be present as police went through his belongings. St. Laurent explained away his repeated assertions during the stationhouse interview that police were going to search the Defendant's apartment by testifying that he would have gotten a warrant if the Defendant had refused to consent.

[3] Before St. Laurent made his first comment that the police would search the Defendant's apartment, he already knew: (1) that two boys were alleging that the Defendant forced them to

Accordingly, the Defendant's consent is not vitiated by St. Laurent's statements suggesting that the police would obtain a warrant to search the Defendant's apartment even if he refused his consent. Given that the Defendant was psychologically capable of granting consent, in fact granted such consent, and was not coerced or tricked into doing so, his consent was both voluntary and valid.

## III.    Alleged *Miranda* Violations During the Jailhouse Interview

The Defendant contends that statements he made during his July 20, 2012 jailhouse interview should be suppressed. He argues that St. Laurent's mere reference to a set of *Miranda* warnings given the day before was inadequate for three reasons: (1) those warnings were faulty when given; (2) even if those warnings were not faulty when given, simply referring to warnings given a day before did not adequately apprise the Defendant of his rights; and (3) the Defendant never executed a valid waiver of his rights.

Because the previous day's *Miranda* warnings were not inadequate, the Court need not discuss the Defendant's first argument. The Defendant's second and third arguments require only slightly more elucidation. Here, St. Laurent read the *Miranda* warnings during the stationhouse interrogation. At the outset of the jailhouse interview, less than twenty-fours later, the Defendant acknowledged that he remembered being read his rights, remained familiar with them, and did not need them repeated.

---

masturbate with a sex toy at knifepoint; (2) that the Defendant was found in the boys' neighborhood talking to a group of children; (3) that the Defendant hosted a sleepover for the boys the previous evening; and (4) that the Defendant had a sex toy matching the boys' description.

The Defendant points to no authority suggesting that *Miranda* warnings grow stale on facts such as these. Some courts have found the opposite. *See, e.g., United States v. Pruden*, 398 F.3d 241, 247-48 (3d Cir. 2005) (no new warnings required where 20 hours passed and officer asked defendant if he recalled earlier warnings); *United States v. Clay*, 408 F.3d 214, 221-22 (5th Cir. 2005) (no new warnings required where two days passed); *United States v. Melendez Santiago*, 544 F. Supp. 2d 76, 87-88 (D.P.R. 2007) (no new warnings required where 26 hours passed).

The Defendant made an uncoerced statement on July 20, 2012 after he was reminded of his rights and acknowledged that he still understood them. The Government has satisfied its burden of proving by a preponderance of the evidence that the Defendant exercised a valid waiver of his *Miranda* rights. Therefore, the arguments the Defendant raises in his final motion to suppress also must fail.

## CONCLUSIONS

For the reasons stated above, the Court **DENIES** the Defendant's motions to suppress evidence.


SO ORDERED.

/s/ Nancy Torresen
United States District Judge


Dated this 10th day of January, 2014.